IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-1039-RPM

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

LOUIS E. RIVELLI,
RODNEY B. JOHNSON,
STEPHEN G. BURKE,
TERESA W. AYERS,
CRAIG L. STEVENSON,
ROBERT T. HOFFMAN,

Defendants

---

ORDER ON DEFENDANT ROBERT T. HOFFMAN'S
MOTION FOR SUMMARY JUDGMENT

---

During the relevant time period Fischer Imaging Corporation ("Fischer" or "the Company") was in the business of designing, manufacturing, and selling medical imaging systems used for the diagnosis and screening of disease. Corporate headquarters were in Denver, Colorado.

The Securities and Exchange Commission (SEC) brought this enforcement action against six former officers and directors of Fischer, alleging a fraudulent scheme to inflate reports of Fischer's profits. The scheme was to inflate revenue by improperly recording income from sales transactions that were not complete. Fischer recognized income when equipment was shipped to

-1-

Fischer-controlled warehouses, where the equipment was stored and insured by Fischer for significant periods of time before purchasers were ready to accept delivery. This recognition of revenue was contrary to Generally Accepted Accounting Principles (GAAP).

As a result, Fischer's financial condition for 2000, 2001 and the first three quarters of 2002 was materially misrepresented in Fischer's SEC filings and public statements. The SEC alleged the defendants violated provisions of the Securities Act of 1933 (the Securities Act), the Securities Exchange Act of 1934 (the Exchange Act), and regulations promulgated thereunder. The SEC seeks civil penalties, disgorgement, pre- and post-judgment interest; injunctive relief restraining future violations of the securities laws, and orders permanently barring some Defendants from serving as officers or directors of any public company.

Defendant Robert T. Hoffman (Hoffman) moved for summary judgment, seeking dismissal of all claims alleged against him. The court heard oral argument on Hoffman's motion on June 30, 2010. Hoffman is named as a defendant in six of the seven claims for relief (the first, second, third, fourth, sixth and seventh claims).

The filed papers show that Hoffman joined Fischer in October 2000 as its Eastern Regional Sales Manager. In that position, he was paid a base salary of $85,000 and commissions. Hoffman worked from his home in Chapel Hill, North Carolina, and reported to Craig Stevenson in Denver, who was then Fischer's Vice President of Sales. Upon joining Fischer, Hoffman was awarded stock options in the amount of 25,000 shares, exercisable over 4 years at 25% per year.

In May 2001, Hoffman became Fischer's National Sales Manager and assumed responsibility for supervising Fischer's entire U.S. sales force. As the National Sales Manager,

Hoffman was paid a base salary of $100,000 per year and received a new commission compensation plan based on Fischer's quarterly revenue. That plan provided for potential quarterly commissions of approximately $28,000 for the second quarter of 2001, and approximately $51,000 per quarter for the third and fourth quarters if Fischer met the revenue targets in the plan. Under the 2001 compensation plan, Hoffman would receive no commission if Fischer achieved less that 50% of the quarterly revenue targets of the plan. Fischer paid Hoffman commissions only upon Fischer's receipt of payment from customers.

After the events in New York City on September 11, 2001 disrupted air travel, Hoffman focused on managing the sales force for the eastern region. In October 2002, Hoffman became Fischer's vice president of sales. This action concerns sales practices of Fischer from January 2000 through September, 2002.

Throughout this period of time, Louis Rivelli, Fischer's President and CEO, presided over sales meetings, which Fischer employees referred to as "production meetings" or "book and ship" meetings. Prospective orders were discussed during these meetings, and Rivelli pressured the sales team to book orders. Hoffman participated in these meetings by telephone.

Rivelli encouraged the use of side letters to reflect contingencies on occasions when a sales transaction could not be finalized because some future action was required by the purchaser, such as board approval. Contingency letters were used with some transactions that Hoffman supervised, and Hoffman wrote some of those letters.

Beginning early in Hoffman's employment with Fischer, he learned that Fischer had a practice of shipping orders designated as "FOB Factory" to Fischer-controlled storage facilities, rather than to customer locations, when customers were not ready for delivery of the equipment.

Hoffman persuaded some customers to accept FOB Factory terms (rather than FOB Destination) by offering to have Fischer pay the cost of insurance while the equipment was in transit.

Near the end of each quarter, Fischer sales staff attempted to resolve (or "clean up") contingencies in orders. Hoffman participated in these so-called "clean up" periods, which typically occurred before the Company's auditors conducted their examinations.

The SEC has provided evidence of Hoffman's participation in eight sales transactions for which revenue was booked prematurely, in violation of GAAP. By way of example, one of those involved an order by Roper Hospital in Charleston, South Carolina. Near the end of the second quarter of 2001, Hoffman drafted and issued a side letter to Roper, granting Roper the right to cancel its order if Roper did not receive state approval for its new facility. The side letter also granted Roper an unqualified right to cancel the order for a month after the end of the quarter. These contingent terms were not reflected in the sales contract. Fischer shipped the product to a warehouse and recognized income on this transaction in the second quarter of 2001, although Roper did not actually take possession of the equipment until June 2002. The SEC's opinion witness stated that the Roper transaction accounted for approximately 23% of Fischer's reported net income for Q2 2001.

Hoffman exercised stock options in October 2001, and immediately sold that stock at a profit of approximately $90,000.

In the first, second, and third claims for relief, the SEC claims that Hoffman violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

To establish a primary violation of Exchange Act Section 10(b) and Rule 10b-5 for misstatements, the SEC must prove that Hoffman (1) made a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) scienter, and (4) use of the jurisdictional means. *Anixter v. Home-Stake Prods. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996); *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006); *Geman v. SEC*, 334 F.3d 1183, 1192 (10th Cir.2003). For primary liability, the requisite intent encompasses recklessness. *Anixter*, 77 F.3d at 1232-33. In cases of alleged public misstatements, the scope of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act is "essentially coextensive." *SEC v. Wolfson*, 539 F.3d 1249, 1257 (10th Cir. 2008).

The claims of primary liability against Hoffman for the alleged misstatements fail under the standard enunciated by the Tenth Circuit in *SEC v. Wolfson*. No reasonable finder of fact could conclude that Hoffman was so involved in creating or communicating the offending misstatement that he can fairly be said to have caused it to be made. *See Woflson*, 539 F.3d at 1261. There is no evidence that Hoffman played any role in deciding when revenue was recognized for particular transactions. There is no evidence that he drafted or prepared Fischer's public statements; no evidence that he ever spoke to Fischer's accountants; no evidence of any public statements attributed to him, and no evidence that he communicated to the investing public in any way.

The plaintiff has not shown sufficient support for claims of *primary* liability against Hoffman under subsections (a) and (c) of Rule 10b-5, based on "a course of business" or a "device, scheme or artifice" that operated as a fraud on sellers or purchasers of stock. This case

involves a fraudulent accounting scheme, and there is no evidence that Hoffman had any control over Fischer's accounting decisions.

The SEC's third claim for relief also alleges that Hoffman *aided and abetted* the scheme in violation of Exchange Act Section 10(b) and Rule 10b-5. To establish that claim, the SEC must prove (1) a primary violation; (2) the defendant's knowledge of the primary violation; and (3) the defendant's substantial assistance to those who committed the primary violation. *Anixter*, 77 F.3d at 1225.

For the purpose of this motion, Hoffman concedes that the SEC's evidence is sufficient to establish a primary violation by others. Hoffman argues that the aiding and abetting claim fails for lack of evidence that Hoffman provided substantial assistance to any primary violator. Hoffman points out there is no evidence that he destroyed, hid, or altered documents or that he actively sought to conceal information from Fischer's senior management, its Board of Directors, or the auditors.

Such evidence is not necessary. What is required is a showing of substantial assistance and there is sufficient evidence to submit that issue to a jury.

There must also be evidence that Hoffman was a knowing and willing participant in the scheme to defraud the public. The SEC argues liability as an aider and abettor requires only recklessness, citing authority pre-dating the enactment of the Private Securities Litigation Reform Act (PSLRA) in 1995.

In 1994, the Supreme Court decided *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994), holding that Section 10(b) of the Exchange Act did not create liability for aiding and abetting violations of securities laws. The rule in the Tenth Circuit had

been that recklessness would satisfy the knowledge requirement for a claim of aiding and abetting securities fraud. *See First Interstate Bank of Denver v. Pring*, 969 F.2d 891, 903 (10th Cir. 1992), *rev'd on other grounds sub nom.*, *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994); *see also Decker v. SEC*, 631 F.2d 1380, 1388 n.16 (10th Cir. 1980); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 595-97 (10th Cir. 1979).

In 1995, with the passage of the PSLRA, Congress restored aiding and abetting liability for enforcement actions brought by the SEC, by adding Section 20(e) to the Exchange Act. That section provides:

> For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that *knowingly* provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e) (emphasis added.)

A majority of district courts have held that because of this statutory change, actual knowledge of wrongdoing is required for aiding and abetting liability. *See SEC v. Lucent Tech., Inc.*, 610 F.Supp.2d 342, 361-362 (D.N.J. 2009) ("Congress intended to require actual knowledge as the scienter standard for aiding and abetting liability"); *SEC v. Johnson*, 530 F.Supp.2d 325, 332-34 (D.D.C. 2008)(concluding that enactment of the PSLRA superseded any pre-existing common law interpretations of the proper scienter standard and now requires actual knowledge); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F.Supp.2d 326, 335 (S.D.N.Y. 2006) ("knowing misconduct must now be shown" for aiding and abetting claims); *SEC v. KPMG, LLP*, 412 F.Supp.2d 349, 382-83 (S.D.N.Y. 2006) (rejecting contention Section 20(e) encompasses recklessness). These cases are persuasive.

In addition to reliance on the Tenth Circuit's pre-PSLRA cases to support its argument that the knowledge requirement for aiding and abetting securities fraud encompasses recklessness, the SEC also cites *Graham v. SEC*, 222 F.3d 994 (D.C.Cir. 2000); *SEC v. Surgilight, Inc*., 2002 WL 31619081 (M.D. Fla. Oct. 15, 2002)(unpublished opinion); *SEC v. Milan Capital Group, Inc.*, 2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000) (unpublished opinion). These cases did not address the effect of Exchange Act Section 20(e).

The question presented is whether the plaintiff's proposed evidence is sufficient to support an inference that Hoffman knew his conduct was making a substantial contribution to a scheme to misrepresent Fischer's financial results in public documents. An affirmative answer is required. Hoffman had substantial sales experience before joining Fischer. He knew that documenting contingent terms in side agreements and offering terms that supported Fischer's use of "ship in place" sales were contrary to common business practices. Hoffman's exercise of stock options in October 2001, and his immediate sale of that stock at a profit may support an inference that Hoffman understood that the market price was buoyed by inflated revenue reports. Under the 2001 commission plan, the amount of Hoffman's commissions was related to Fischer's reported quarterly revenues. A jury may conclude that Hoffman understood that Fischer was using improper accounting practices to inflate revenues which would yield a benefit to him. The SEC has presented sufficient evidence to support its claim that Hoffman was a knowing and willing participant in the fraudulent scheme.

In the fourth and seventh claims for relief, the SEC alleged that Hoffman falsified Fischer's books and records or aided and abetted or caused other persons to falsify Fischer's books and records, in violation of Exchange Act Section 13(b)(2), 15 U.S.C. § 78m(b)(2), and

Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1. That rule provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account. The false books and records referred to in this claim are the allegedly inaccurate revenue numbers for years 2000, 2001, and the first three quarters of 2002 in Fischer's accounting records.

Although a defendant need not actually write the entry to be held liable, the SEC's evidence is not sufficient to support the fourth and seventh claims against Hoffman. Nancy Young was the person who made the revenue entries, and Young did not report to, or take direction from Hoffman. There is no evidence that Hoffman concealed any information from Young or from any of Fischer's senior management. It is undisputed that Hoffman disclosed to Young all facts relating to sales orders for which he was responsible, including contingencies.

In the sixth claim for relief, the SEC alleges that Hoffman aided and abetted Fischer's filing of materially false SEC annual and quarterly reports in violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Exchange Act Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13. Hoffman's arguments regarding this claim incorporate his arguments regarding aiding and abetting liability under Exchange Act Section 10(b) and Rule10b-5. Those arguments have been addressed above.

Based on the foregoing it is

ORDERED that Defendant Robert T. Hoffman's motion for summary judgment is granted as to the first, second, fourth and seventh claims and they are dismissed. The motion is denied as to the aiding and abetting claims alleged in the third and sixth claims for relief.

Dated: July 14, 2010

BY THE COURT:

s/Richard P. Matsch

———————————————————
Richard P. Matsch, Senior District Judge